## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SHAMIA FRANKLIN, et al.,** | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Case No: 1:24-cv-00146-JMC |
| **CLEO AI INC.,** | | |
| | * | |
| *Defendant.* | | |

\* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, Shamia Franklin and Devon Chapman, individually and on behalf of all others similarly situated, filed the present lawsuit against Defendant, Cleo AI Inc., on January 16, 2024, alleging violations of the Maryland Consumer Loan Law, Md. Com. Law §§ 12-301, *et seq.* (Count I); the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* (Count II); the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693, *et seq.* (Count III); and the Maryland Consumer Protection Act, Md. Com. Law §§ 13-101, *et seq.* (Count IV).  (ECF No. 1).  Currently before the Court are two motions: (1) Defendant's Motion to Compel Arbitration or Dismiss for *Forum Non Conveniens* (ECF No. 20); and (2) Plaintiffs' Unopposed Motion for Leave to File a Surreply (ECF No. 25).  The motions are fully briefed (ECF Nos. 23, 24) and no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  For the reasons that follow, Plaintiffs' motion will be granted and Defendant's motion will be denied.

## I.      BACKGROUND

Both individual Plaintiffs are Baltimore County, Maryland, residents.  (ECF No. 1 at 2).[1] Defendant "is a technology company headquartered in New York, New York" that "makes loans or advances to Maryland consumers over the internet."  *Id.*  Specifically, Defendant operates a "lending app" named "Cleo," ("Cleo App") through which it provides consumers with cash advances in two forms: standard and expedited.  *Id.* at 3.  "Users must pay a $5.99 monthly fee to obtain any type of advance," but "Users must also pay a $3.99 per advance fee, or a $14.99 monthly fee, to obtain an expedited advance."  *Id.*

To obtain an advance through the Cleo App, "users must link a bank account."  *Id.*  Users must also satisfy Defendant's underwriting criteria, which limits most users to obtaining advances between $20.00 and $70.00, "although some users are able to obtain advances of up to $100.00."  *Id.*  Defendant "requires repayment of its advances and fees on a specific date, which usually is the date a user's employer deposits a paycheck into their linked bank account."  *Id.*  "Users cannot obtain an advance without authorizing [Defendant] to automatically charge a payment card to cover [Defendant's] fees and the principal amount of any advance."  *Id.*  Further, Defendant requires its users to authorize Defendant "to automatically initiate a debit of their linked bank account in the event that [Defendant] is unable to obtain payment by charging its fees and the principal amount of any advance to a user's payment card."  *Id.* at 4.  Plaintiffs posit that this system "can cause consumers to incur overdraft fees, or insufficient fund fees, if an account does not have sufficient funds to cover [Defendant's] automatic debits."  *Id.*

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document.  At the motion to dismiss stage, the Court "accept[s] as true all well-pleaded facts and construe[s] them in the light most favorable to the plaintiff."  *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022).

Defendant advertises its cash advance product as a "0% APR," "0% interest" product.  *Id.*

However, Plaintiffs claim that this is wholly untrue.  "For example, a $50.00 advance, with a $3.99

express fee, a $5.99 monthly fee, and a two-week repayment schedule yields a 518% APR."  *Id.*

"The same advance with a $14.99 monthly fee yields a 986% APR."  *Id.*  Plaintiffs further allege

that Defendant "does not disclose the APRs of its cash advances before, during, or after any

transaction, which allows [Defendant] to mislead borrowers to believe its advances are '0% interest'

and '0$ APR.'"  *Id.*

Plaintiffs compare Defendant's practices "to the APRs associated with payday loans."  *Id.*

These loans are generally "balloon loans," or loans which require that a consumer repay its principle

amount, along with any fee(s) associated therewith, "in a single installment, generally on payday."

*Id.* at 7.  But "Despite [Defendant's] cash advances being just as costly as payday loans, [Defendant]

obtains repayment of its advances, along with fees that yield triple digit APRs and are intended to

provide [Defendant] compensation for lending money, at a rate of at least 97%."  *Id.* at 6.  Plaintiffs

claim that this "can result in a detrimental cycle of debt, and incentivize poor money management

habits."  *Id.* at 7.

Specifically relevant to Plaintiffs, both individual Plaintiffs "obtained cash advances from

[Defendant], and used those advances for personal, family, and/or household purposes," although

the Complaint does not provide the amounts or dates of those advances.  *Id.* at 8.  In doing so,

Plaintiffs paid Defendant's fees without knowledge that they were subject to additional interest

charges and ultimately faced fees yielding "double- and triple-digit APRs," leading Plaintiffs to file

the present lawsuit.  *Id.*  Plaintiffs also seek to pursue the above claims "on behalf of all those

similarly situated" who were subject to Defendant's allegedly unlawful practices.  *Id.*

## II.    LEGAL STANDARD

### A.  Motion for Leave to File a Surreply

Local Rule 105.2(a) provides as a general rule that "surreply memoranda are not permitted to be filed."  Loc. R. 105.2(a) (D. Md. 2023).  "Though surreplies are generally not permitted . . . the Court in its discretion may allow a party to file a surreply."  *Demendoza v. Burlington Coat Factory Warehouse Corp.*, No. CV ADC-22-2726, 2024 WL 249393, at *2 (D. Md. Jan. 23, 2024). "This discretion is typically exercised to allow parties to respond to new matters raised for the first time in the opposing parties' reply briefs."  *Id.*  Surreplies may also be appropriate where "the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003).  The party seeking leave to file a surreply "must demonstrate the need for a surreply" beyond "merely respond[ing] to arguments addressed" in the opposing party's previous filing.  *Friends of Lubavitch v. Balt. Cnty., Md.*, 421 F. Supp. 3d 146, 158 n.7 (D. Md. 2019).  Here, Plaintiffs' motion for leave to file a surreply is unopposed by Defendant, as further indicated by Defendant's choice to not file an opposition within the time to do so.  *See* Loc. R. 105.2 (D. Md. 2023).  Plaintiffs' motion is therefore granted and the Court will review Plaintiffs' surreply—attached to their motion as an exhibit—in assessing Defendant's motion *infra*.

### B.  Motion to Compel Arbitration

"Federal courts have authority to compel arbitration, but in making that determination this Court is mindful that its role is limited to determining the 'question of arbitrability,' or the 'gateway dispute about whether the parties are bound by a given arbitration clause.'"  *Kop-Flex Emerson Power Transmission Corp. v. Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge No. 1784, Dist. Lodge No. 4*, 840 F. Supp. 2d 885, 890 (D. Md. 2012) (quoting *Howsam v. Dean Witter*

*Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  "[A]rbitration clauses are enforced in court by way of

Federal Rule of Civil Procedure 12(b)(3) motions to dismiss for improper venue.  In considering

such motions, courts may examine evidence outside the pleadings — including, as relevant here,

the contract containing the applicable arbitration clause." *Amos v. Amazon Logistics, Inc.*, 74 F.4th

591, 594 n.2 (4th Cir. 2023) (citing *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365 (4th Cir.

2012)).  The Court may also consider exhibits submitted in connection with a Rule 12(b)(3) motion

such as witness declarations.  *See, e.g.*, *Miller v. Maxim Healthcare Servs., Inc.*, No. 1:22-CV-

01782-JRR, 2023 WL 2957413, at *1 n.1 (D. Md. Apr. 14, 2023).

     Motions to compel arbitration are often governed by the Federal Arbitration Act ("FAA"),

which provides in relevant part that:

> A written provision in any maritime transaction or a contract evidencing a
> transaction involving commerce to settle by arbitration a controversy thereafter
> arising out of such contract or transaction, or the refusal to perform the whole or
> any part thereof, or an agreement in writing to submit to arbitration an existing
> controversy arising out of such a contract, transaction, or refusal, shall be valid,
> irrevocable, and enforceable, save upon such grounds as exist at law or in equity
> for the revocation of any contract.

9 U.S.C. § 2.  "Under the [FAA], a court must stay 'any suit or proceeding' pending arbitration of

'any issue referable to arbitration under an agreement in writing for such arbitration.'" *Hill v.

Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (quoting 9 U.S.C. § 3).  "A litigant in

federal court may compel arbitration under the FAA upon a demonstration of: (1) the existence of

a dispute between the parties; (2) a written agreement that includes an arbitration provision to cover

the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate

or foreign commerce; and (4) the failure, neglect, or refusal of the other party to arbitrate the

dispute." *Naimoli v. Pro-Football, Inc.*, 692 F. Supp. 3d 499, 507 (D. Md. 2023).  "The Supreme

Court has directed that we apply ordinary state-law principles that govern the formation of

contracts, and the federal substantive law of arbitrability" in resolving motions to compel arbitration under the FAA.  *Hill*, 412 F.3d at 543 (quotations omitted).  "Thus, state law determines questions concerning the validity, revocability, or enforceability of contracts generally, but the FAA creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."  *Id.* (quotations omitted).

"A plaintiff is obliged [] to make only a prima facie showing of proper venue in order to survive a motion to dismiss.  In assessing whether there has been a prima facie venue showing, we review the facts in the light most favorable to the plaintiff."  *Aggarao*, 675 F.3d at 366; *see also Dixon v. LGX Servs., LLC*, No. 1:23-CV-00703-JMC, 2023 WL 4664033, at *2 (D. Md. July 19, 2023) ("The party resisting arbitration must make the showing that the claims should be settled by litigation rather than arbitration.").

## C.  Motion to Dismiss for *Forum Non Conveniens*

"[A] court may dismiss an action under the doctrine of *forum non conveniens* when the relevant public and private interests strongly favor trial in an alternate forum."  *Brown v. Stallworth*, 235 F. Supp. 2d 453, 455 (D. Md. 2002) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)).  "This doctrine allows a court to dismiss a case when the original venue is highly inconvenient and an adequate alternative venue exists."  *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 470–71 (4th Cir. 2018), *as amended* (Mar. 27, 2018).  "The Supreme Court has explained that 'the central focus of the *forum nonconveniens* inquiry is convenience.'"  *Millennium Inorganic Chemicals Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 686 F. Supp. 2d 558, 561 (D. Md. 2010) (quoting *Piper*, 454 U.S. at 248).  Federal courts consider both "private and public factors" in determining whether dismissal is proper under the doctrine of *forum non conveniens*.  *Id.*  "The relevant private interest factors

include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining willing witnesses; and (4) other practical problems involving efficiency and expense of trial." *Id.* The "primary concern" when evaluating these private interest factors is "to ensure that the plaintiffs did not select an inconvenient forum for the purpose of harassing the defendants." *Id.* On the other hand, "[t]he public interest factors consist of the: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided 'at home;' (3) interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; (4) avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) unfairness of burdening citizens of an unrelated forum with jury duty." *Id.* (citing *Gulf Oil Corp. v Gilbert*, 330 U.S. 501, 508–09 (1947)); *see also Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 200 (4th Cir. 2009).

## III.   ANALYSIS

### A.   Defendant Cannot Force Plaintiff Chapman to Arbitrate Under Either Maryland or California Law

Defendant first argues that arbitration is proper under Rule 12(b)(3) as to Plaintiff Chapman because Plaintiff Chapman entered into a valid agreement to arbitrate his claims raised in this lawsuit. (ECF No. 20-1 at 16–23). As evidenced by the exhibits submitted in connection with this motion and the parties' representations in their briefs, Plaintiff Chapman signed up with the Cleo App on roughly November 29, 2019. (ECF No. 20-1 at 9; ECF No. 23 at 8; ECF No. 20-2 at 3–4). In doing so, Plaintiff Chapman was required to click a button stating that he agreed to Defendant's terms and conditions, with the phrase "terms and conditions" containing a hyperlink to Defendant's then-current policies. (ECF No. 20-2 at 4; ECF No. 23 at 8). Plaintiff Chapman was not required to follow that hyperlink in order to agree to the terms and conditions, but he was nevertheless unable

to proceed with establishing his account until he clicked the box indicating that he agreed to the terms and conditions (available via the hyperlink).   (ECF No. 20-1 at 8).   One particular term/condition therein read: "Your salary advance payments and repayments are processed by our loan provider Synapse.  By using a salary advance you agree to {https://synapsefi.com/tos-evolve] Synapse's Terms of Service."   (ECF No. 20-3 at 20).   In turn, Synapse's then-current terms and conditions read as follows:

> ANY CLAIM, DISPUTE OR CONTROVERSY OF WHATEVER NATURE ARISING OUT OF OR RELATING TO THE TERMS OF SERVICE SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION IN ACCORDANCE WITH THE PROCESS DESCRIBED IN THE SECTION TITLED 'BINDING ARBITRATION' BELOW.     PLEASE   READ   THE   SECTION   TITLED 'BINDING ARBITRATION' CAREFULLY . . .

> **e.       Binding Arbitration**
> Any controversy or claim arising out of or relating to these Terms of Service, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  In any arbitration arising out of or related to the Terms of Service, the arbitrators will award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with those aspects of its claims or defenses on which it prevails, and any opposing awards of costs and attorneys' fees awards will be offset . . .

> **ARBITRATION WITH RESPECT TO A CLAIM IS BINDING AND NEITHER PARTY WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM THROUGH A COURT.  IN ARBITRATION THE PARTIES WILL NOT HAVE THE SAME RIGHTS THAT APPLY IN COURT, SUCH AS THE RIGHT TO A TRIAL BY JUDGE OR JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN PROCEEDINGS BROUGHT BY OTHERS SUCH AS CLASS ACTIONS OR SIMILAR PROCEEDINGS. IN ADDITION, THE RIGHT TO DISCOVERY AND THE RIGHT TO APPEAL MAY ALSO BE LIMITED OR ELIMINATED IN ARBITRATION. ALL OF THESE JUDICIAL RIGHTS ARE WAIVED WITH RESPECT TO CLAIMS THAT THE PARTIES ELECT TO ARBITRATE.**

(ECF No. 20-3 at 39, 44–45) (emphasis in original).  Synapse's terms of service state that: "If you are reading [them], that means (1) you are using a website or phone application that uses Synapse

to power your banking needs . . . By using these services, you agree to Synapse's Terms of Service and Privacy Policy . . . ." *Id.* at 38.  Synapse's terms of service also provide that they "are governed by the laws of the State of California."  *Id.* at 45.  Further, Defendant's terms and services at that time provided that:

> Subject to the next paragraph, you agree that any dispute between you and us regarding these terms or any Contract will only be dealt with by the English courts, except that if you live in Scotland or Northern Ireland, you can choose to bring legal proceedings either in your country or in England, but if we bring legal proceedings, we may only do so in your country.

(ECF No. 20-3 at 20).[2]

Plaintiff Franklin registered with Defendant's app on roughly October 18, 2018.  (ECF No. 20-1 at 11–12; ECF No. 23 at 8).  Plaintiff Franklin was likewise required to click a button indicating that she agreed to Defendant's terms and conditions—which were accessible via a hyperlink—in order to allow Plaintiff Franklin to complete the sign-up process.  (ECF No. 20-1 at 12).  "Unlike the November 2019 version of [Defendant's] Terms and Conditions that Mr. Chapman accepted, the [then-current] version did not mention Synapse."  *Id.*  However, Defendant's terms and conditions at that time contained the same forum-selection clause.  *See* (ECF No. 20-3 at 35). Thus, Defendant's terms and conditions which Plaintiff Chapman manifested assent to contained an arbitration clause through Synapse's terms and conditions, whereas Defendant's terms and conditions which Plaintiff Franklin manifested assent to contained only the forum selection clause (as is relevant for this motion).

Plaintiffs argue that Plaintiff Chapman cannot be forced to arbitrate his claims because the arbitration clause was within *Synapse's* terms and conditions, and that Defendant

---

[2] As Defendant clarifies in its opposition, the exhibit labeled "Carvey 1," ECF No. 20-3 at 5–21, is the November 2019 version of Defendant's terms and conditions.  *See* (ECF No. 20-1 at 9 n.1; ECF No. 20-3 at 3).  The exhibit labeled "Carvey 2," ECF No. 20-3 at 22–36, is a copy of Defendant's terms and conditions as of the date that Plaintiff Franklin registered with Defendant's app.  *See* (ECF No. 20-3 at 3).

"cannot enforce that contract as a non-signatory." (ECF No. 23 at 17). Both parties correctly cite Maryland and California state law indicating that non-signatories may enforce arbitration agreements in limited circumstances under the doctrine of equitable estoppel. For example, the Maryland Court of Special Appeals (now the Appellate Court of Maryland) explained in *Griggs v. Evans* that the doctrine of equitable estoppel permits non-signatories to enforce an arbitration provision in two instances:

> [T]he first instance [is] when a signatory must rely on the terms of the written agreement [containing the arbitration clause] in asserting [its] claims, and seeks to claim the benefit of such an agreement while simultaneously attempting to avoid the terms of an arbitration provision contained therein . . . The second instance [is] when the signatory to the contract containing [an] arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non[-]signatory and one or more of the signatories to the contract.

205 Md. App. 64, 84–85 (2012) (internal quotations and citations omitted). California courts have likewise explained that "Under California law, a nonsignatory to a contract may enforce an arbitration provision under the doctrine of equitable estoppel when the claims [against the nonsignatory] are intimately founded in and intertwined with the underlying contract." *Herrera v. Cathay Pac. Airways Ltd.*, 94 F.4th 1083, 1087–88 (9th Cir. 2024) (quotation omitted).

Here, the Court agrees with Plaintiffs that, under either State's substantive law, Defendant is not in a position to enforce Synapse's arbitration provision as a non-signatory thereto. The Court is receptive to Defendant's argument that it necessarily would be unable to provide cash advances to customers like Plaintiffs without utilizing Synapse's services as an electronic funds transferer, which are consequently subject to the above arbitration provisions. (ECF No. 20-1 at 22–23). However, Plaintiffs' claims do not hinge on Defendant's purported violation of Synapse's terms and conditions. Nor does Plaintiffs' lawsuit rely on Synapse's terms and conditions to hold Defendant liable under the above statutes. In opining that an entity was not entitled to enforce an

arbitration provision which it was not a signatory to, one California court previously explained that, in order for the doctrine of equitable estoppel to apply in this context, "the plaintiff's allegations must rely on or depend on the terms of the written agreement, not simply on the fact that an agreement exists." *Goldman v. KPMG, LLP*, 92 Cal. Rptr. 3d 534, 551–52 (2009). That court relied on the Fifth Circuit's explanation in *Palmer Ventures LLC v. Deutsche Bank AG*, 254 F. App'x 426 (5th Cir. 2007), regarding when the doctrine of equitable estoppel does not apply:

> While [the document at issue] may play a role in the ultimate outcome of this suit, it is not a part of Plaintiffs' causes of action . . . In this case, Plaintiffs are not trying to have it both ways [by seeking to hold the nonsignatory liable pursuant to duties imposed by the agreement, but at the same time denying applicability of the agreement's arbitration clause] because Plaintiffs are not relying on the [document] to hold [the nonsignatory defendant] liable. As a result, equitable estoppel does not permit [the nonsignatory] to enforce the arbitration agreement.

*Goldman*, 92 Cal. Rptr. 3d at 552 (quoting *Palmer*, 254 F. App'x at 432).

One factually similar California case is *Smith v. Google, LLC*, No. 23-CV-03527-PCP, 2024 WL 1171653 (N.D. Cal. Mar. 19, 2024). In *Smith*, Google—the only defendant—sought to require the plaintiffs to arbitrate their claims against Google "on the basis of their purported arbitration agreement with H&R Block (which [was] not a party in this case)." *Id.* at *1. Those plaintiffs' "claims against Google [did] not rely on their purported agreement with H&R Block, and they [did] not allege interdependent and concerted misconduct by Google and H&R Block that [was] founded in or intimately connected with any obligations created by the purported agreement with H&R Block." *Id.* Rather, the plaintiffs filed suit against Google for allegedly mishandling their financial data, a cause of action that existed independent of any language in the H&R Block agreement containing the arbitration provision. *Id.* Similar to Defendant's argument in this case, "Google argue[d] that plaintiffs' claims ar[o]se from their use of H&R Block's service, and that plaintiffs could not have used this service at all without assenting to H&R Block's agreement and the

arbitration provision it included." *Id.* at *3.  The court declined to apply equitable estoppel on that ground.  Rather, the court explained that "it is not enough for an agreement to be one but-for causal link in a chain of events leading to the circumstances underlying a claim; the claim itself must stem from or be intertwined with the agreement." *Id.*  The court justified its holding by noting that the plaintiffs' claims did "not involve violation of any duty, obligation, term or condition imposed by the . . . [H&R Block] agreement, nor [were] they founded in or even tangentially related to any duty, obligation, term or condition imposed by the . . . [H&R Block] agreement.  Here[,] the claims are fully viable without reference to the terms of the purported agreement." *Id.* (cleaned up).

Turning to the instant case, Plaintiff Chapman will not be estopped from refusing to arbitrate.  Under the above Maryland standards, Plaintiff Chapman's claims do not rely on the language or construction of Synapse's terms and conditions; Plaintiff Chapman does not seek to benefit from certain provisions of Synapse's terms and conditions while disowning his obligations under others; and Plaintiff Chapman raises no allegations that Defendant and Synapse engaged in any interdependent and/or concerted misconduct giving rise to Plaintiffs' claims.  The *Griggs* court explained that Maryland courts previously applied the doctrine of equitable estoppel where plaintiffs' claims "hinged on their asserted rights" under the pertinent contracts containing arbitration provisions, which is inapplicable here.  *Griggs*, 205 Md. App. at 84–85.

The same conclusion applies under California law, as Plaintiff Chapman is not seeking selective enforcement of Synapse's terms and conditions (or their enforcement at all); Plaintiff Chapman is not asserting that Defendant violated any duty, obligation, term, or condition imposed by Synapse's terms of service; and Plaintiff Chapman's claims appear fully viable without reference to Synapse's terms of service.  *See, e.g. DMS Servs., LLC v. Superior Ct.*, 140 Cal. Rptr. 3d 896, 905 (2012) (reversing trial court's decision to compel arbitration because "The question is not

whether the actions are related, but whether the action against a nonsignatory to the arbitration agreement is rooted in the contract containing the arbitration agreement").   In other words, Plaintiffs' claims that Defendant engaged in unlawful business practices arise entirely separate and independent from Synapse's terms of service, which Plaintiffs' Complaint does not rely upon at all in bringing this lawsuit.  This is further supported by the Synapse arbitration clause being limited to "Any controversy or claim arising out of or relating to these Terms of Service, or the breach thereof," which would not apply to Plaintiff Chapman's claims regarding Defendant's allegedly improper financial practices.  (ECF No. 20-3 at 44).[3] The Court therefore concludes that Defendant cannot enforce the Synapse arbitration clause under either Maryland or California law because it is not a signatory thereto and there is insufficient justification for applying the doctrine of equitable estoppel.

    B.  Plaintiffs' Lawsuit is Not Subject to Dismissal Under the Doctrine of *Forum Non Conveniens*

Defendant next argues that dismissal of both Plaintiffs' claims is proper because they agreed to Defendant's terms and conditions when registering with the Cleo App, including the above forum-selection clause.  (ECF No. 20-1 at 24).  "As a general matter, courts enforce forum selection clauses unless it would be unreasonable to do so."  *BAE Sys*, 884 F.3d at 470 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).  "This presumption of enforceability, however,

---

[3] Plaintiffs also highlight in their opposition that the Synapse terms and conditions make various efforts to separate itself from any potential liability that its business cooperators may incur through improper practices independent of Synapse's services as a financial intermediary.  *See, e.g.* (ECF No. 20-3 at 41) (disclaiming responsibility for "the goods or services that you pay for using [Synapse's] services, including but not limited to those offered by your Platform and other third parties"); (ECF No. 20-3 at 43, 44) (disclaiming control of, or liability for, "any products or services" offered by participating "platforms"); (ECF No. 20-1 at 21) (conceding that Defendant is a "platform" within the context of the Synapse terms and conditions); *cf. Dye v. Santander Consumer USA Inc.*, No. 1:23-CV-45, 2024 WL 251148, at *3–4 (N.D.W. Va. Jan. 23, 2024) (precluding non-signatory from enforcing arbitration clause where the agreement containing the clause did not contemplate enforcement by a non-signatory, the "plain language" of the agreement containing the arbitration clause "ma[d]e clear" that it did not "intend to entangle itself" with disputes not originating under its express terms, and the arbitration agreement was limited to disputes arising under its terms).

only applies if the forum selection clause is mandatory rather than permissive." *Id.* "A mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but does not bar litigation elsewhere." *Id.*

"In the typical case, the defendant invoking *forum non conveniens* 'bears a heavy burden in opposing the plaintiff's chosen forum.'" *Id.* at 470–71 (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 430 (2007)). "When considering a motion to dismiss on *forum non conveniens* grounds, a court must determine that the alternative forum is available to the plaintiff, that the alternate forum is adequate, and that the alternative forum is more convenient in light of the public and private interests involved." *DiFederico v. Marriott Intern., Inc.*, 714 F.3d 796, 800 (4th Cir. 2013). "The defendant bears the burden of proving the adequacy, availability and overall convenience of the alternative forum." *Id.* at 800–01. But as the Fourth Circuit has explained:

> [T]hat framework is modified . . . in the context of a valid forum selection clause. Most importantly, a forum selection clause reverses the presumptions that would otherwise apply: instead of heavily favoring the plaintiff's chosen forum and placing the burden on the defendant, the forum selection clause is 'given controlling weight in all but the most exceptional cases,' and the plaintiff bears the burden of proving why it should not be enforced.

*BAE Sys.*, 884 F.3d at 471. This burden shifting also depends on whether the forum-selection clause at issue is permissive or mandatory, as referenced above. "If it is mandatory, then [a plaintiff] bears the burden of proving why it should not be enforced. If it is permissive, then the traditional *forum non conveniens* analysis applies and [a defendant] bears a heavy burden in opposing [a plaintiff's] alternative forum." *Id.* at 471–72.

Here, the forum-selection clause at issue is mandatory given its inclusion of "specific language of exclusion." *Id.* at 472; *see* (ECF No. 20-3 at 20, 35) ("[Y]ou agree that any dispute between you and us regarding these terms or any Contract will *only* be dealt with by the English courts . . . .") (emphasis added). There is thus a presumption in favor of enforceability absent a

showing from Plaintiffs to the contrary.  This presumption may be overcome, and the forum-selection provision may be deemed unreasonable, if Plaintiffs demonstrate that "(1) [its] formation was induced by fraud or overreaching; (2) the complaining party 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; *or* (4) [its] enforcement would contravene a strong public policy of the forum state." *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (emphasis added) (quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991)).  This Court and others in this Circuit have also concluded that "a forum selection clause may be unreasonable if it points to a forum to which the action has no connection." *Ripley v. Long Distance Relocation Servs., LLC*, No. CV CCB-19-0373, 2019 WL 5538343, at *4 (D. Md. Oct. 25, 2019); *see also Sears Cont., Inc. v. Sauer Inc.*, 378 F. Supp. 3d 435, 442 (E.D.N.C. 2019).

The parties present competing interpretations regarding whether the forum-selection clause is binding under English law and, more generally, whether reference to English law is warranted in assessing the reasonableness of the forum-selection clause.  "[T]he majority rule" is that "a federal court interpreting a forum selection clause must apply federal law in doing so." *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010).  This is because "The appropriate venue of an action is a procedural matter that is governed by federal rule and statutes.  Thus, when a court is analyzing a forum selection clause, which changes the default venue rules applicable to the agreement, that court will apply federal law and in doing so, give effect to the parties' agreement." *Id.* (citing *Bremen*, 407 U.S. at 12–13).  With this in mind, the Court need not opine on Plaintiffs' argument that the forum selection clause is non-binding under English law because the forum-selection clause is unreasonable under federal law regardless.  *See id.* at 651 (noting that, even after

discussing the effect of English law, the forum-selection clause at issue must still be reasonable under the factors listed above from *Allen* (originating from *Bremen*)).

Plaintiffs have set forth sufficient argument demonstrating that enforcing the forum-selection clause would be gravely inconvenient given the facts of this case and result in forcing Plaintiffs to litigate their claims in a forum with little connection to this case. Regarding inconvenience, Plaintiffs identify that forcing them to litigate their claims in English courts would require extensive travel, additional costs, and litigating in a foreign judicial system despite this case involving a New York-headquartered corporation's conduct in Maryland under Maryland consumer protection statutes and their related federal analogs.[4] This ties into the second reason warranting non-enforcement of the forum-selection clause, namely that this lawsuit involves little to no connection to England or its courts. Defendant is incorporated in Delaware with its headquarters in New York and is being sued based exclusively on its conduct with Maryland consumers. *See* (ECF No. 23 at 16) (providing citations to the State of Delaware's Division of Corporation's website regarding Defendant's incorporation therein). More generally, Plaintiffs also cite to various sources indicating that the vast majority of Defendant's business and consumer base is in the United States. *Id.* Defendant rebuts that it has close connections with England because its parent corporation is based in the United Kingdom with many employees of that parent corporation residing there. (ECF No. 24 at 16). But Defendant's parent company is not the subject of this lawsuit and the facts giving rise to Plaintiffs' claims hinge exclusively on their domestic interactions with an entity that is both incorporated and headquartered in the United States. In fact, Defendant's own website provides its current terms of service (last updated April 5, 2024), which now includes

---

[4] Although Plaintiffs do not clearly argue this point in their opposition or surreply, Defendant asserts that none of Plaintiffs' claims exist under English law, which also suggests that forcing Plaintiffs to litigate in English courts may deprive Plaintiffs of a potential remedy. (ECF No. 24 at 19).

a forum-selection clause for Wilmington, Delaware.  *See* (ECF No. 23 at 16); *Terms and Conditions*, Cleo AI Ltd., https://web.meetcleo.com/page/term-conditions (last visited July 19, 2024).  Federal law within this Circuit provides that such factual circumstances warrant non-enforcement of the forum-selection clause.  *See Ripley*, 2019 WL 5538343, at *4; *Sears*, 378 F. Supp. 3d at 441–43; *Doe v. New Leaf Acad. of N.C. LLC*, No. 8:10-CV-02365-JMC, 2011 WL 4434051, at *5 (D.S.C. Sept. 22, 2011) ("[T]he circumstances of this case taken together with the obvious lack of relationship of the chosen forum to the dispute between the parties warrant a finding that the forum selection clause is unenforceable here."); *cf. Coors Brewing Co. v. Oak Beverage, Inc.*, 549 F. Supp. 2d 764, 772 (E.D. Va. 2008) (transferring case from the Eastern District of Virginia to the Southern District of New York because there was little "connection to the cause of action in [Virginia] in contrast to New York, which is closely connected to this case").

Under the above relevant factors, including the *Bremen* factors argued by Plaintiffs in their opposition, Plaintiffs have satisfied their burden of demonstrating that the forum-selection clause here is unreasonable.  The Court therefore also denies Defendant's motion to the extent that it seeks dismissal under the doctrine of *forum non conveniens*.

### IV.    CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that Plaintiffs' Unopposed Motion for Leave to File a Surreply (ECF No. 25) is **GRANTED**.  It is further **ORDERED** that Defendant's Motion to Compel Arbitration of Dismiss for *Forum Non Conveniens* (ECF No. 20) is **DENIED**. Defendant shall file an answer to Plaintiffs' Complaint within twenty-one (21) days from the date of this Memorandum Opinion and Order, at which time the Court will issue a proposed scheduling order governing next steps in this case.

Date: <u>July 19, 2024</u>                                          <u>          /s/                    </u>
                                                                                    J. Mark Coulson
                                                                                    United States Magistrate Judge