# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SHAMIRA FRANKLIN, et al.,** | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Case No: 1:24-cv-00146-JMC |
| **CLEO AI INC.,** | * | |
| *Defendant.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Shamira Franklin and Devon Chapman (collectively "Plaintiffs") filed the present lawsuit individually and on behalf of all others similarly situated on January 16, 2024, against Cleo AI Inc. ("Defendant"). (ECF No. 1). Plaintiffs then amended their Complaint on June 5, 2025, after submissions regarding a discovery dispute between the parties, dropping their federal claims. (ECF Nos. 62, 63). Thereafter, Plaintiffs solely plead violations of the Maryland Consumer Loan Law, Md. Code Ann., Com. Law §§ 12-301, *et seq.* (Count I); the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et seq.* (Count II); and the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law §§ 14-201, *et seq.* (Count III). (ECF No. 56). After Plaintiffs filed the Amended Complaint, Defendant filed a Motion to Dismiss for Failure to State a Claim on June 20, 2025. (ECF No. 59). While the Motion to Dismiss for Failure to State a Claim was pending, the Court directed the parties to incorporate a discussion of subject matter jurisdiction into their motion to dismiss memoranda, as Plaintiffs' Amended Complaint no longer alleges a federal cause of action. (ECF No. 64).

Presently before the court is Plaintiffs' Request for Leave to Amend raised in their Opposition to Defendant's Motion to Dismiss. (ECF No. 65 at 12).[1] On the issue of subject matter jurisdiction, the Court has now considered Plaintiffs' Opposition to Defendant's Motion to Dismiss, Defendant's Reply thereto, and Plaintiff's Notice of Supplemental Authority. (ECF Nos. 65, 66, 67). No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons set forth below, Plaintiffs' Amended Complaint is dismissed without prejudice for lack of subject matter jurisdiction. Motion for Leave to Amend will be denied, and Defendant's Motion to Dismiss is denied as moot.

## I.    BACKGROUND

### A.    Relevant Factual Background

Plaintiffs are Baltimore County, Maryland residents who obtained cash advances through Defendant's mobile app called "Cleo" ("Cleo App") (ECF No. 56 at 2). Plaintiffs posit that Defendant offers a "short term, high-cost cash advance product." *Id.* at 1. Defendant operates the Cleo App by advancing up to $250.00 of a person's paycheck per pay period after users have signed up for a membership. *Id.* at 3. Defendant offers two different memberships: a Cleo Plus plan, which charges users $5.99 per month or a Cleo Builder plan, which charges users $14.99 per month. *Id.* Then, "Defendant requires borrowers to repay their cash advances on payday." *Id.* at 6. To do so,

> Defendant requires borrowers to: (i) have an employer that pays them regularly; (ii) link the bank account into which paychecks are deposited to the Cleo [A]pp; and (iii) authorize Defendant to automatically debit the linked account on payday in an amount equal to a borrower's cash advance (the principal loan amount) and the additional charges that the borrower paid when taking out the cash advance.

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. Where a document does not have an electronic filing stamp, the Court is referring to the page numbers at the bottom of the document.

*Id.*

In addition, the Cleo App charges an "express fee" for users who seek access to cash advances instantaneously rather than several days later. *Id.* at 5. Plaintiffs allege that the express fee charge "has ranged from $3.99 to $9.99." *Id.* Further, Plaintiffs assert that "[v]irtually every borrower paid this charge" because it entitles the users to instant access to their advances. *Id.* at 6. Plaintiffs do not specify what amount within the above range, "[v]irtually every borrower paid." *Id.*

Plaintiffs "obtained cash advances from [Defendant]" for personal, family, and/or household purposes and "paid charges that equal triple- and quadruple-digit APRs." *Id.* at 11. Specifically, Plaintiff Franklin alleges payment of a $5.99 monthly fee and $3.99 express fee in order to obtain a $40.00 advance "which was to be repaid in seven days." *Id.* The Amended Complaint does not specify for how long either Plaintiff maintained a monthly subscription commitment; average costs paid to Defendant; the average advance value; how much, if any principal payment Defendant obtained without advancing cash; or how much money Defendant may owe Plaintiffs Franklin or Chapman.

B. Relevant Procedural History

Plaintiffs seek class certification under Federal Rule of Civil Procedure 23. *Id.* at 11. Plaintiffs assert that "[t]here are thousands of members of the class," and "[t]he class is identifiable by the records of Defendant and Plaintiffs and the class members." *Id.* at 11. Under the Amended Complaint, the sole basis for Plaintiffs asserting subject matter jurisdiction arises from the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *Id.* Indeed, the Amended Complaint omits claims under the Truth and Lending Act ("TILA") and the Electronic Funds Transfer Act ("EFTA"). (ECF 64 at 1). The Court therefore directed the parties to address the issue of subject matter jurisdiction in their motion to dismiss memoranda (ECF Nos. 65, 66) and deferred any

resolution of the pending discovery dispute (ECF Nos. 62, 63) until confirmation that this Court has subject matter jurisdiction over this case.

In response, Plaintiffs insist that this Court has subject matter jurisdiction under the CAFA, (ECF No. 56 at 2), though they concede that the Amended Complaint "does not include allegations concerning the amount in controversy." (ECF No. 65 at 12). Plaintiffs, with the Defendant's consent, seek leave to amend the complaint to include the following allegation: "There are tens of thousands of members of the class, and these persons obtained over five million dollars in cash advances from Defendant, and paid millions of dollars in fees to Defendant on those advances, at a time when the Defendant was not licensed under the MCLL[.] The class is identifiable by the records of Defendant and Plaintiffs and the class members." *Id.* In its reply, Defendant asserts in one footnote that "the putative class Plaintiffs allege contains more than 100 members seeking $5 million in damages." (ECF No. 66 at n.1). The parties do not raise any other arguments pertaining to subject matter jurisdiction. (ECF Nos. 65, 66).

## II.     LEGAL STANDARD

### A.  Subject Matter Jurisdiction

Courts have "a burden to address Article III jurisdiction sua sponte." *Wild Va.. v. Council of Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022) (emphasis omitted); *Plyler v. Moore*, 129 F.3d 728, 731 n.6 (4th Cir. 1997) (holding that subject matter jurisdiction is an issue that "may be raised at any time by either party or *sua sponte*"); *Hertz Corp. v. Friend*, 599 U.S. 77, 94 (2010). Indeed, courts must address the issue of subject matter jurisdiction before considering the merits of a case.[2] *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999). Article III courts possess "only the authority granted by the Constitution and Congress." *Scott v. Cricket Commc'ns., LLC*,

---

[2] The Court assumes all allegations are true for the purposes of analyzing subject matter jurisdiction.

865 F.3d 189, 194 (4th Cir. 2017) (citing *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008)).

Congress enacted the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), which creates a basis for subject matter jurisdiction over class action lawsuits, if "(1) the parties are minimally diverse in citizenship, i.e., 'any member of a class of plaintiffs is a citizen of a State different from any defendant,' (2) the number of proposed class members is 100 or more; and (3) the aggregate amount in controversy exceeds $5 million." *Skipper v. CareFirst BlueChoice, Inc.*, No. DLB-21-1022, 2023 WL 2410858, at *3 (D. Md. Mar. 8, 2023) (quoting 28 U.S.C. § 1332(d)); *see also Scott*, 865 F.3d at 195 (citation omitted).

Facts showing subject matter jurisdiction "must be affirmatively alleged in the complaint." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). Moreover, the "burden of establishing subject matter jurisdiction is on…the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010). Courts must "presume…that a case lies outside the limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2010). When a plaintiff asserts subject matter jurisdiction under CAFA, a mere "conclusory invocation of CAFA is insufficient to establish subject matter jurisdiction without specific factual allegations that allow the court to draw reasonable inferences of the jurisdictional prerequisites." *Skipper*, 2023 WL 2410858, at *3 (citing *Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 195 (4th Cir. 2017) (citation omitted)).

### B. Leave to Amend

Federal courts may grant leave to amend freely. Fed. R. Civ. P. 15(a). However, courts need not grant leave to amend when it "would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (citation and internal quotation marks omitted). When a

court lacks subject matter jurisdiction and the proposed amendment fails to cure the jurisdictional deficit, the "amendment is therefore futile under Rule 15(a)." *Smith v. Maryland,* Civil Action No. RDB–11–2007, 2012 WL 3596098, at *7 (D. Md. Aug. 20, 2012); *see also MTB Servs., Inc. v. Tuckman-Barbee Constr. Co.*, No. RBD-12-2109, 2013 WL 1819944, at *3 (D. Md. Apr. 30, 2013).

## III.    ANALYSIS

Plaintiffs agree that the Amended Complaint "does not include allegations concerning the amount in controversy" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). (ECF No. 65 at 12). Plaintiffs contend that inserting the following language is sufficient to show an aggregate amount in controversy exceeding $5 million: "There are tens of thousands of members of the class, and these persons obtained over five million dollars in cash advances from Defendant, and paid millions of dollars in fees to Defendant on those advances, at a time when the Defendant was not licensed under the MCLL[.] The class is identifiable by the records of Defendant and Plaintiffs and the class members.[3]" (ECF No. 56 at 11). Plaintiffs insist this language "is enough to allege that at least five million dollars is at issue" under Md. Code Ann., Com. Law §§ 12-314(b)(1)(i)(3). *Id.* Moreover, Defendant asserts in one footnote that "the putative class Plaintiffs allege contains more than 100 members seeking $5 million in damages.[4]" (ECF No.66 at n.1). Despite the Court's Order directing the parties to "incorporate discussion of subject matter jurisdiction into their motion to dismiss memoranda," (ECF No. 64 at 2), the parties have

---

[3] Diversity is not in dispute. Plaintiffs plead that they reside in Baltimore County, Maryland and that Defendant is a technology company headquartered in New York, New York. (ECF No. 56 at 2). These facts support an inference that there is minimal diversity. *Skipper*, 2023 WL 2410858, at *3.

[4] It is well settled that "the consent of the parties is irrelevant" to a court's subject matter jurisdiction. *Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 684, 702 (1982). (citation omitted); *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 851 (1986) ("the parties cannot by consent cure the constitutional difficulty for the same reason the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2").

raised no other arguments regarding the amount in controversy or number of class members. (ECF Nos. 65, 66). Neither party has addressed how the court can plausibly infer that the facts alleged support an amount in controversy in excess of $5 million. (ECF Nos. 65, 66).

For the reasons described below, Plaintiffs are not entitled to leave to amend to create jurisdiction, subject matter jurisdiction does not exist under the Amended Complaint, and even if Plaintiffs included the proposed amendment, it would not create jurisdiction.

**A. The Amended Complaint Fails to Allege Subject Matter Jurisdiction under the CAFA.**

Because the Plaintiffs' response to this Court's order directing the parties to address subject matter jurisdiction merely insists that an amendment will create jurisdiction, the Court considers whether the Amended Complaint is sufficient *sua sponte. Wild Va. v. Council of Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022) (emphasis omitted)*.* A detailed review of the present allegations make clear that the Amended Complaint, and the proposed further amendments thereto, force the Court to speculate that the amount in controversy is satisfied.

*Skipper v. CareFirst BlueChoice, Inc*., provides guidance on analogous facts. 2023 WL 2410858, at *3. In *Skipper*, plaintiffs sought to establish a class consisting of couples incurring out of pocket costs associated with frozen embryo transfers in Maryland over a three-year period. *Id*. at *1-*2. As to the number of potential class members, plaintiffs alleged that the defendant insurer provided coverage to 3.4 million people in Maryland, D.C. and Virginia, that a nationwide study found that approximately 74% of embryo transfers involved frozen embryos, and that more than 6000 embryo transfers were performed in Maryland in the same year as the survey. *Id*. at *3. While this Court found that such allegations were sufficient to support a plausible inference that there

were over 100 class members,[5] they were not sufficient to support a plausible inference that the amount in controversy exceeded $5 million. *Id.* As a starting point, this Court noted that for purposes of satisfying the CAFA's amount in controversy requirement, a court must begin by "multiplying the number of potential class members by the average damages each class member sustained." *Id.* That, in turn, means a court "must be able to reasonably infer, at the very least, how many people in Maryland were insured by [the defendant] during the relevant period" in order to calculate the amount in controversy. *Id.* But while the Court was comfortable concluding the number of such persons was more than 100, greater precision was required to determine the amount in controversy. *Id.* In that regard, the Court could not determine how many of defendant's insured were in Maryland (versus D.C. and Virginia), and, of that number, how many were denied coverage for embryo thawing. *Id.* Even applying the assumptions urged by plaintiffs—that 74% of the 6000 transfers involved frozen embryos and the amount per couple was $900, would not yield an amount in controversy that would meet the $5,000,000 CAFA standard without more specific information regarding how many of those were insured by defendant. *Id.* Thus, this Court dismissed the case for lack of subject matter jurisdiction. *Id.* at *4.

The amount in controversy allegations in the instant case similarly fail to specify necessary details that would enable this Court to multiply the purported "tens of thousands" of

---

[5] The *Skipper* court noted Plaintiffs were "informed and believe[d] the Class include[d] hundreds of members" *Skipper*, 2023 WL 2410858, at *3. This Amended Complaint seeks to certify "All persons with a Maryland address, who obtained an advance or loan from Defendant" (ECF No. 56 at 11). While it asserts that "there are tens of thousands of members of the class, and that the class is identifiable by the records of Defendant and Plaintiffs and the class members," it does not assert any other facts showing there would indeed be tens of thousands of members of the class. A liberal interpretation of this allegation may support an inference that there are at least 100 members of the class under *Skipper*. *Skipper*, 2023 WL 2410858, at *3 (recognizing that an allegation that plaintiffs were informed and believed there were hundreds of members of the class that could be found in the defendant's records supported an inference that the class was greater than 100 members). Whether it is concrete enough to provide a basis upon which the Court can reasonably infer the amount in controversy is the separate issue analyzed here.

class members by the average damages each class member sustained.[6] This Court cannot plausibly infer either how many plaintiffs there may be (other than the alleged "tens of thousands" "identifiable by the records of Defendant and Plaintiffs and the class members") or the average damages each class member suffered.

To calculate the average damages, this Court must be able to plausibly infer the advanced-cash value and the monthly fee value. Then, the Court must multiply the average damages by the proposed number of class members. *Skipper*, 2023 WL 2410858, at *3. Accordingly, this Court must be able to plausibly infer facts like (1) how many plaintiffs are part of the class (to multiply by each member's damages); (2) the average advance-cash value per class member (to determine the amount at issue per transaction); (3) the average number of class members who paid the express fee (to determine the amount at issue per transaction); (4) the average number of transactions each class member made (to determine the total advance-value damages); (5) the average duration of each class member's subscription (to calculate how much each plaintiff paid in monthly fees); and (6) the average subscription choice, whether that be $5.99 per month or $14.99 per month (to calculate how much each plaintiff paid in monthly fees). *Id.* (citing *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014).

Neither the Amended Complaint nor the proposed additional amendment alleges specific facts to infer the necessary inferences. In *Denson v. Capital Jazz Inc.*, this Court considered the sufficiency of an amount in controversy allegation under CAFA. Civ No. 22-2526, 2023 WL 3027434, at *3 (D. Md. Apr. 20, 2023). There, the plaintiffs alleged that the putative class representatives suffered a combined damages amount "totaling $9,875." *Id.* They went on to

---

[6] Nor do Plaintiffs make any factual allegation regarding the average or total advanced amount in the Amended Complaint.

allege that a "substantial number of customers" "paid as much as $8,478." *Id.* However, they failed to "specify the amounts that the would-be[putative plaintiffs] paid to [defendant]." *Id.* at *4. The Court reasoned that the complaint "[fell] short of the specific factual allegations necessary to allow this Court to draw reasonable inferences of CAFA's jurisdictional prerequisites." *Id.* (internal quotations omitted). In other words, it was not enough to allege that some plaintiffs paid up to a specific amount. *Id.* Accordingly, the Court dismissed the case for lack of subject matter jurisdiction. *Id.*

The allegations here are even more ambiguous and contain more variables than those in *Denson*. Here, Plaintiffs do not even assert how much Plaintiff Franklin or Plaintiff Chapman are owed. For example, Plaintiffs allege that Plaintiff Franklin paid a "$5.99 monthly fee and a $3.99 express fee to obtain a $40.00 cash advance," but they do not allege how long Plaintiff Franklin kept her subscription, how many advancements she sought, or how many times she paid the express fee. (ECF No. 56 at 11). As alleged, those allegations may plausibly support a claim of $9.98 by Plaintiff Franklin, which would require an assumed class of more than 500,000 Marylanders to meet the required amount in controversy threshold, far more than the "tens of thousands" asserted in Plaintiffs' proposed amendment. The Amended Complaint is silent as to Plaintiff Chapman. *Id.* Simply asserting that some number of plaintiffs paid some amount of money is not enough. *Denson*, 2023 WL 3027434, at *4. As with the plaintiffs in *Denson* who failed to specify the amounts that the would-be putative plaintiffs paid to the defendant, Plaintiffs here fail to specify how much any plaintiff, let alone the putative class, sought in advancements or paid in monthly fees or for how long. *Denson*, 2023 WL 3027434, at *4. Instead, like the *Denson* assertion that some plaintiffs "paid as much as $8,478," Plaintiffs here assert the Cleo App provided advancements "up to $100.00" "in the past" and "currently provides up to $250.00" per

pay period and offer multiple membership plans or other optional fees. (ECF No. 56 at 3, 5); *Denson*, 2023 WL 3027434, at \*4. Even under a liberal construction, this framework does not provide the Court with sufficient facts to draw a reasonable inference that the putative class sought advancements or incurred membership fees in an aggregate total exceeding $5 million. Recognizing that the monthly payments must be made on a regular basis, it is plausible to infer that there could be a great amount of money at issue. But there are simply too many variables to infer the total payments exceed $5 million. *See id; see also Skipper*, 2023 WL 2410858, at \*3 (concluding that the complaint was deficient when it had to speculate to determine the amount in controversy).

Moreover, to the extent the statistics represented in Plaintiffs exhibits assert factual allegations, they are overly broad and insufficient.[7] (ECF Nos. 56-1-56-10). Specifically, one study proposes "[t]he average transaction value is $108.18" across a pool of unspecified Earned Wage Access providers in Maryland. (ECF No. 56-10 at 6). However, the same study represented that the "most common advance amount ranges between $25 and $100.[8]" (ECF No. 56-10 at 3). These allegations suffer from the same deficiency as the *Skipper* allegation. *Skipper*, 2023 WL 2410858, at \*3. Similar to the *Skipper* allegation that failed to clarify how many plaintiffs were Maryland residents out of the 3.4 million individuals insured in multiple states, these allegations fail to clarify which, if any, of the transactions represent Cleo App users out of the unnamed earned

---

[7] Neither Plaintiffs nor Defendant has raised the argument that the exhibits (ECF Nos. 56-1-56-10) create a factual basis upon which the Court may infer subject matter jurisdiction. (ECF Nos. 65, 66). To the contrary, Plaintiffs recognize the amount in controversy allegations are deficient. *Id.* The Court nevertheless reviewed all relevant facts in an attempt to determine the amount in controversy.

[8] Notably, Plaintiffs make clear that the Cleo App did not enable users to withdraw amounts greater than $100.00 "in the past." (ECF No. 56 at 3). To rely on this statistic alone, the Court would have to speculate that an unspecified number of putative plaintiffs—at some time in the past—were withdrawing some amount equal to or less than $100.00, and sometime later started withdrawing an amount greater than $100.00 such that the average advance could later rise to $108.18. There is no factual basis upon which the Court can do so. *See Skipper*, 2023 WL 2410858, at \*3. Amended Complaint does not clarify when each maximum advance rate took effect, nor does it allege an average advance cash value or average number of advancements the putative class sought out. *See id.*

11

wage access apps considered in that statistic.[9] *Id.* Simply put, it casts too wide a net. *See id.* Therefore, the Court cannot rely on an advanced-cash value allegation that relies on all earned wage access products. *Id.*

The Amended Complaint also cites a nationwide study. (ECF No. 56-1). In that study, the researchers concluded that the average advance amount for Cleo users is $39.00. (ECF No. 56-1 at 14). The dataset "included 14,514,724 transactions for 16,422 individuals over an 18-month period." (ECF No. 56-1 at 8). This statistic falls squarely under *Skipper*. *Skipper*, 2023 WL 2410858, at *3. The Court cannot determine how many—if any—of the members participating in this dataset are Marylanders or represent Marylanders. *See id.* This deficiency alone was fatal to the complaint in *Skipper*. *Id.* However, even assuming the national average from this study represents the average in Maryland, it would be plausible only to infer that the class members sought an average of $39.00 in advanced cash from Cleo in 18 months. It would not be plausible to infer how many class members exist, how many transactions each person made, or how many of these advancements added the express fee. Therefore, this Court cannot plausibly infer an amount in controversy exceeding $5 million from the Amended Complaint. *Id.*; *see also Denson*,

---

[9] Similarly, ECF No. 56-5 represents that 35% of users sought out 6 advances in one month but relied upon the following dataset:

> All calculations are based on 3,575 advances in checking account transactions data from 01/2021–06/2024 from 86 SaverLife members. SaverLife is a nonprofit financial technology company, and its members are mostly low-moderate-income individuals. EWA users were identified by creating filters for deposits containing EWA company names, including direct-to-consumer products Dave, Brigit, MoneyLion Instacash, Cleo, EarnIn, FloatMe, Empower, Albert Instant, Varo Advance, Klover, and employer-partnered products DailyPay, Branch, PayActiv, ZayZoon, Tapcheck, Rain, Instant Financial, Immediate, Wagestream, One@Work (formerly Even). Note that EWA users in the SaverLife sample are not necessarily representative of EWA users at large.

(ECF No. 56-5 at 2).

Accordingly, this statistic does not support an inference that it is representative of Cleo App users. *Skipper*, 2023 WL 2410858, at *3.

2023 WL 3027434, at *4 (recognizing that a Complaint fails when it "contains no concrete damages figures that allow this Court to reasonably infer" the amount in controversy is met).

**B. Even if the Court granted Plaintiffs Leave to Amend, the Proposed Amount in Controversy Allegation is Futile.**

The Court now considers whether leave to amend would be proper. Plaintiffs insist that Fed. R. Civ. P. 15(a)(2) permits Plaintiffs to amend the complaint so they can plead their jurisdictional prerequisites. (ECF No. 65 at 12). While the court should "freely" grant leave as "justice so requires," amendments are not necessary when they would be futile. Fed. R. Civ. P. 15(a); *Laber v.* Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (citation and internal quotation marks omitted); *see also Smith v. Maryland,* Civil Action No. RDB–11–2007, 2012 WL 3596098, at *7 (D. Md. Aug. 20, 2012) (holding that a proposed amendment did not create subject matter jurisdiction and was therefore futile). Granting leave to amend is a matter within the court's discretion. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Rhodomoyer v. Wells Fargo Bank, N.A.*, Civil Action No. RDB 12–3806, 2013 WL 1964831, at *5-6 (D. Md. May 10, 2013) (denying leave to amend when a "highly speculative" proposed amendment lacked factual support in the complaint).

Plaintiffs' proposed allegation—that as many as "tens of thousands" obtained over five million dollars in cash advances and paid millions in membership fees—is a conclusory invocation of the CAFA that fails to make specific factual allegations necessary for Plaintiffs to carry their burden. *See Skipper*, 2023 WL 2410858, at *3. For the reasons stated above, simply adding a conclusory allegation that the putative class paid an excess of $5 million to an already fact-deficient complaint does not create subject matter jurisdiction. *See Rhodomoyer*, 2013 WL 1964831, at *6 (denying leave to amend to increase the amount in controversy allegation when the pleaded facts did not support it). Therefore, leave to amend is futile because the proposed

allegation does not cure the jurisdictional defect. *Smith v. Maryland,* Civil Action No. RDB–11–2007, 2012 WL 3596098, at *7.

### IV. CONCLUSION

For the reasons stated above, Plaintiffs' motion for leave to amend (ECF No. 65 at 12) is DENIED, and Plaintiffs' Amended Complaint (ECF No. 56) is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction. Defendant's Motion to Dismiss (ECF No. 59) is DENIED as moot.

SO ORDERED.

Dated: September 3, 2025 

                                   /s/

                                 J. Mark Coulson
                                 United States Magistrate Judge